**CAFFE RIBS, INC., Appellant,**

**v.**

**The STATE of Texas, Appellee.**

**No. 14–08–00057–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Dec. 28, 2010.

Alan B. Daughtry, Houston, for appellant.

Walter C. Brocato, Susan Desmarais Bonnen, Austin, for appellee.

Panel consists of Justices ANDERSON, FROST, and BOYCE.

## OPINION

WILLIAM J. BOYCE, Justice.

Caffe Ribs appeals from a judgment on a jury verdict awarding $4.5 million in this eminent domain proceeding for the State's whole taking of a 7.5214 acre parcel of land and improvements. In multiple issues, Caffe Ribs challenges the trial court's evidentiary rulings. We reverse and remand for a new trial because (1) evidence relating to an agreement to pay for costs associated with environmental contamination of the property erroneously was excluded at trial, and (2) exclusion of this evidence was harmful.

## Background

The State of Texas acquired the subject property as part of the construction, reconstruction, maintenance, and operation of the highway system. The property is located on Old Katy Road near the northwest intersection of Beltway 8 and Interstate Highway 10.

The property was used to manufacture and store oil field equipment beginning in 1955; over the next four decades, these activities resulted in environmental contamination. From 1977 to 1988, Weatherford U.S., Inc. owned and used the property for drilling tool fabrication and repair. Property improvements included a parts warehouse, assembly shop, display room, machine shop, and office.

Although the Paul Revere Variable Annuity Insurance Company foreclosed on the property in 1988, Weatherford maintained operations at the property as a lessee until 1992. Paul Revere sold the property to Caffe Ribs for $487,000 in February 1995. Under the written agreement between Paul Revere and Caffe Ribs, it was "expressly understood and agreed that Buyer shall accept the conveyance of the Property in its present condition, 'AS–IS, WHERE–IS[.]'" Caffe Ribs also agreed "to accept the conveyance of the Property subject to any presently known or subsequently discovered Hazardous Materials or Hazardous Materials Contamination." Pursuant to this agreement, Paul Revere retained the exclusive right to evaluate and analyze the property's environmental condition and to "take such action as it deems necessary or appropriate, in its sole discretion and expense, with regard to the environmental condition of the Property."

In March 1996, Paul Revere and Weatherford executed an "Environmental Remediation Agreement" in which the par-

ties [1] acknowledged:

> By Special Warranty Deed with Vendor's Lien dated February 16, 1995, Paul Revere conveyed the Property to Caffe Ribs, Inc., a Utah, corporation ("Caffe Ribs"). Paul Revere has agreed with Caffe Ribs to perform certain environmental work on the Property. The belief that environmental work may be necessary is based on certain environmental assessments previously performed.... The environmental assessments have detected certain Hazardous Materials Contamination on the Property. Paul Revere and Weatherford desire to cooperate in (i) completing certain environmental assessments, (ii) performing certain environmental remediation work, and (iii) allocating the costs for such as set forth in this Remediation Agreement and wish to evidence their agreements hereby.

Using information provided by a consultant, Paul Revere and Weatherford agreed to determine the extent of Weatherford's contribution to the subject property's contamination. Weatherford is responsible for remediation "to the extent of its proportional contribution to such contamination" The Environmental Remediation Agreement states: "Without the express written consent of the other party, neither party may assign this Remediation Agreement nor delegate any duties or obligations hereunder except as expressly provided herein." By January 2005, the State had executed its own "Remediation and Indemnity Agreement" with Weatherford International, Inc.

On May 27, 2005, the State filed a petition seeking to condemn the property. A Special Commissioners Hearing was held on July 19, 2005; Caffe Ribs, Paul Revere,

Houston Community College, Spring Branch Independent School District, Harris County, and the City of Houston were jointly awarded $7,372,000 in damages for the condemnation of the property. Caffe Ribs and the State filed objections to the Special Commissioners' award, and the administrative proceeding was converted into a civil case.

On August 25, 2005, the State deposited the Special Commissioners' award into the county civil court at law registry. On May 15, 2006, the county civil court at law granted a request by Caffe Ribs and Paul Revere to withdraw the Special Commissioners' award. According to the order, Caffe Ribs was allowed to withdraw $6,459,500 from the court registry, and Paul Revere was allowed to withdraw $912,500.

In preparation for trial, Caffe Ribs and the State could not agree on the use of evidence relating to environmental contamination of the subject property. Caffe Ribs subsequently filed a motion to exclude evidence of environmental contamination. At the hearing on this motion, Caffe Ribs focused largely on its argument that the State had agreed to exclude environmental evidence by virtue of a Rule 11 agreement. Caffe Ribs also argued:

> [T]hese [contamination] issues shouldn't come forward in Court because ... State law requires the responsible party to reimburse the landowner, which is [Caffe Ribs] in this case, for the expenses of any environmental cleanup that may occur. And there ... was a contract in place before the date of taking to require Weatherford to cover certain expenses incurred by [Caffe Ribs] in this case....

---

1. Officers of both Weatherford U.S., Inc. and its successor, Weatherford Enterra U.S., L.P., signed the Agreement.

During the hearing, the court opined that both parties were "talking around" the one legal question it thought relevant, *i.e.*, "What amount of testimony regarding the actual contamination of the property on the date of taking ought to come in?" The court further stated it was "not sure that ... who's paying for the remediation is really addressing that." At a later hearing, the court informed the parties it was going to admit the State's evidence of contamination. This ruling is not challenged on appeal.

Caffe Ribs presented testimony at trial from appraiser Rudy Robinson, commercial real estate developer David Klein, and environmental engineer Richard Bost.

Robinson valued the property at $9.9 million. He concluded that, as of the date of acquisition, "the property would not suffer ... an additional environmental deduction over and above the applicable remaining cleanup cost, if any."

On cross-examination, the State challenged Robinson's selection of several of his comparable sales; the State contended that the sales were not comparable because they involved parcels that were not contaminated. The State also elicited testimony from Robinson that (1) several of the substances found on Caffe Ribs's property were carcinogens, and (2) an environmental engineering report contained a "strong suggestion" that some of these cancer-causing chemicals were migrating off site.

During Caffe Ribs's redirect examination of Robinson, the following exchange occurred:

Q. [BY CAFFE RIBS'S COUNSEL] Have you reviewed records that indicate who was on the hook to pay for the remediation costs of any chemicals of concern found underground or in the water at this site?

A. Yes.

Q. Who was it?

\* \* \*

A. Weatherford International.

Q. The owner, whoever that is—and at this time it was Caffe Ribs, Incorporated—had the right to get Weatherford International to pay for any costs of clean up?

A. It's my understanding that ... they were identified as the responsible party ... for whatever cleanup costs were going to be incurred at the site and indemnification and remediation agreements that had been executed.

THE COURT: Counsel, approach.

After an unreported bench conference, Caffe Ribs's counsel abandoned this line of questioning.

Klein testified about the factors he considers in deciding whether to buy a piece of property. He opined about several favorable qualities of the subject property, particularly its location. On cross-examination, the State elicited Klein's testimony that he would "look into" whether a particular property had a plume of underground solvents or chemicals under it. Klein identified potential concerns relating to such a plume focusing on (1) identifying the responsible party, and (2) determining whether the plume was migrating. On redirect, Klein testified that he did not know Caffe Ribs was not the responsible party. The court immediately cautioned Caffe Ribs's counsel: "And counsel, you're approaching."

Bost testified about the status of remediation on the subject property. He stated that, as of the date of acquisition, all known soil contamination had been remediated; he later acknowledged that additional contamination was found when the State removed structures after the date of the taking. Bost also testified about levels

of groundwater contamination. He opined that, for practical purposes, the primary source material of the groundwater contamination had been removed.

The State objected when Caffe Ribs's counsel asked Bost whether a responsible party was named in records he reviewed from the Texas Commission on Environmental Quality. The following exchange occurred between Caffe Ribs's counsel and the court:

[CAFFE RIBS'S COUNSEL]: I wasn't aware the identification of the responsible party was—

THE COURT: We discussed how much it cost and you weren't going to discuss whose responsibility it was. That was [the] ruling.

[CAFFE RIBS'S COUNSEL]: I thought the costs themselves is [sic] what we agreed on.

THE COURT: And you are the responsible party.

Later in the proceedings, the court stated:

The issue is what is the fair market value of the property, it's not how much . . . is it going to cost to clean it up and bring it back to where just anybody would want to buy it.

The issue is what is the fair market value on that date and with whatever willing buyer is willing buyer [sic], given as it is, polluted, unpolluted, mostly remediated, halfway remediated, not remediated at all.

The court further indicated that who had to pay for the remediation was irrelevant to the fair market value of the property.

During cross-examination, the State inquired about contamination levels for each test well on the property and elicited Bost's testimony that these levels exceeded the approved level for drinking water.

The State also asked about a cleanup lasting 17 years at another site where contamination migrated off-site and the neighboring residents filed a lawsuit because of the pollution.

In addition to the court's limitations on the testimony described above, the court excluded (1) testimony from Bost and former Texas Commission on Environmental Quality employee Vince Rorick regarding the State's alleged interference with remediation on the property, and (2) Rorick's testimony about when a certificate of completion would have issued had Weatherford's original remediation plan remained in place. The court also excluded testimony from appraiser Andrea Fahrenthold, who would have opined that the property's market value was $11.5 million without taking contamination into consideration.

At the end of its case-in-chief, Caffe Ribs presented offers of proof; these included Bost's testimony that Weatherford was responsible for paying remediation costs on the subject property. Bost further testified during the offer of proof that Weatherford was responsible to Caffe Ribs and to any prospective purchaser of the property. Bost answered "yes" to a question asking whether Weatherford was "the responsible party in—before the date of taking to the owner or any prospective purchaser of the subject property?" Caffe Ribs's counsel represented that Rorick would have testified that Weatherford was the responsible party, and that Rorick believed Weatherford had been fulfilling its obligation. The State objected to this testimony by Bost and Rorick. The trial court sustained the objections and excluded the evidence.

The State presented testimony from environmental engineer Ashby McMullan

and real estate appraiser David Dominy.[2] McMullan concluded that the subject property's soil and groundwater were contaminated, and estimated it would take from five to eight years to remediate the groundwater contamination.

Like Caffe Ribs's appraiser, Dominy determined that the subject property's highest and best use was commercial; however, Dominy disagreed with Caffe Ribs's positive analysis of the property's features. Based on what he determined to be comparable sales, Dominy concluded that the subject property would sell for $10 per square foot (a total of $3,276,330.21) if it were on the market in a clean condition and ready for development. Dominy also considered the contamination issues. Using a discounted cash flow analysis and taking into consideration that a complete cleanup of the property would take eight years, he calculated the present value of the property at $803,431. He then subtracted $122,180 for the cost of demolishing the improvements. His final value determination was $681,251. Dominy also testified that a lender would consider the contaminated nature of the property because, if the borrower were to default, the lender "would be left holding the bag on the contaminated property."

The jury was asked in a single question to determine the "market value" of the subject property "including improvements thereon, condemned for highway purposes on August 25, 2005, valued as a fee simple estate." The term "market value" was defined as "the price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it...."

The jury was instructed to "tak[e] ... into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available within the reasonable future." The jury also was instructed to consider the "highest and best use of the land involved." The term "highest and best use" was defined as "the reasonably probable and legal use of vacant land or an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." The jury further was instructed that "[t]he four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility and maximum profitability."

The jury returned a unanimous verdict finding that the property had a market value of $4.5 million. The trial court entered judgment in conformity with the jury's verdict; based in part on Caffe Ribs's prior withdrawal of $6,459,500, the trial court ordered Caffe Ribs to pay the State $2,872,000.

Caffe Ribs filed a combined motion for new trial, motion for judgment notwithstanding the verdict, and motion to correct, modify, and reform the judgment. The combined motion was overruled. Caffe Ribs timely appealed.

### Analysis

**A. Overview**

2. During the hearing on motions in limine, Caffe Ribs moved to strike a portion of Dominy's appraisal based on a projection of value eight years into the future. The court observed that Caffe Ribs had not filed a motion to exclude expert testimony under *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex.1995). The court allowed that Caffe Ribs could object to Dominy's testimony, but overruled the motion to strike. During Dominy's testimony, Caffe Ribs objected to testimony regarding the discounted cash flow analysis and supporting documents on grounds that this evidence was conjectural and speculative. The court overruled Caffe Ribs's objections.

Caffe Ribs raises eight issues on appeal.

In its first issue, Caffe Ribs argues that it was denied a fair trial "on the market value of its property" due to cumulative error arising from multiple evidentiary rulings about which it complains in more detail in issues two through five.

In its second issue, Caffe Ribs contends that, given the State's evidence that market value would be significantly affected by potential environmental liability and remediation cost, the trial court committed reversible error by refusing to admit evidence relating to an indemnity obligation addressing potential environmental liability.

In its third issue, Caffe Ribs argues that, given the State's focus on Caffe Ribs's failure to obtain a certificate of completion, the trial court reversibly erred by excluding evidence of the State's interference with remediation activities.

In its fourth issue, Caffe Ribs argues that the trial court committed harmful error when it excluded Rorick's testimony contradicting the State's assumption that the property could not be developed for up to eight years.

In its fifth issue, Caffe Ribs claims that the trial court reversibly erred by admitting Dominy's expert opinion because it was based on the improper assumption the property could not have been developed for eight years and, thus, led to an improperly applied discount rate and improperly calculated market value.

In its sixth issue, Caffe Ribs contends that it is entitled to a new trial because a substantial portion of Dominy's testimony is missing from the reporter's record.[3]

In its seventh issue, Caffe Ribs asserts that the trial court's exclusion of Caffe Ribs's appraisal expert Farenthold constituted harmful error.

Finally, in its eighth issue, Caffe Ribs asks this court to reverse and render judgment in its favor. It argues that, because Dominy's market value opinion constituted incompetent and inadmissible evidence, the only competent market value evidence before the jury was the testimony of its appraisal expert Robinson, who concluded the property's market value was $9.9 million.

■■■ Generally, when a party presents an issue that would result in rendition, an appellate court should address that issue first. *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) (per curiam). Caffe Ribs's rendition request in its eighth issue rests on the premise that, without Dominy's testimony, the only evidence of value is Robinson's testimony that the property was worth $9.9 million. Caffe Ribs's complaint on appeal relates only to the part of Dominy's opinion that rested on a discounted cash flow analysis. Caffe Ribs does not challenge Dominy's testimony that, if the property were on the market clean and ready for development, it would sell for $10 per square foot, or a total of $3,276,330.21. Thus, even absent Dominy's valuation based on the discounted cash flow analysis, there is conflicting evidence on the value of the property. Under these circumstances, rendition would not be appropriate even were we to agree with Caffe Ribs on the issue of Dominy's discounted cash flow analysis. *See Wegner v. State*, 829 S.W.2d 922, 923 (Tex.App.Tyler 1992, writ denied) (remanding when landowners' experts presented two after-taking valuations of prop-

---

3. A supplemental reporter's record containing the missing testimony was filed in this court on July 7, 2009, a few weeks after Caffe Ribs filed its initial brief. Therefore, we do not consider Caffe Ribs's sixth issue.

erty). Accordingly, we overrule Caffe Ribs's eighth issue.

We turn now to Caffe Ribs's second issue because it is dispositive.

## B. Exclusion of Evidence Regarding Weatherford's Responsibility for Environmental Costs

In issue two, Caffe Ribs contends that "although the State argued that the market value would be significantly affected by potential environmental liability and remediation costs, the trial court unfairly prevented Caffe Ribs from demonstrating third-party indemnity for such liability and minimal costs of remediation." Caffe Ribs's complaint encompasses the court's exclusion of evidence relating to Weatherford's indemnification agreement with Caffe Ribs's seller, under which Weatherford was responsible for remediation of the contamination it had caused. Additionally, Bost testified during an offer of proof that Texas Commission on Environmental Quality files identified Weatherford as the party responsible for remediation costs, and that Weatherford was responsible before the date of the taking to the property owner and to any prospective purchaser of the subject property.

The scope of the trial court's ruling is not disputed on appeal. As set forth above, the court called Caffe Ribs's counsel to the bench after he first elicited Robinson's testimony that Weatherford was the responsible party. On at least two occasions thereafter, the court warned Caffe Ribs away from this topic. The court confirmed on the record that it had ruled that evidence of the responsible party for remediation was inadmissible. The court answered "correct" when Caffe Ribs's counsel stated: "I think it's fair to say—correct me if I'm wrong—that the Court has ruled the responsible party, the responsible party for remediation is inadmissible!" Later during this discussion,

Caffe Ribs's counsel stated: 'But your Honor, it's the pink elephant in the courtroom. Everybody's going to think it's going to cost money and everybody's going to think it's going to cost whoever owns the property money." The court responded: "But that's not an issue in the case. The issue is what was the fair market value on that date. The issue is not how much is it going to cost to clean up the property. That's not the case."

■■ Determining whether to admit or exclude evidence lies within the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex.2007); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.2001); *see Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex.2009). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex.2002). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *Id.* An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

■■ To reverse a judgment based on a claimed error in admitting or excluding evidence, a party must show that the error probably resulted in an improper judgment. Tex.R.App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220. In determining whether the excluded evidence probably resulted in the rendition of an improper judgment, we review the entire record. *Interstate Northborough P'ship*, 66 S.W.3d at 220.

## I. Was the exclusion of evidence erroneous?

The sole issue tried below was the subject property's market value. This appeal focuses on the scope of evidence relevant to this inquiry.

Texas Rule of Evidence 402 provides, "All relevant evidence is admissible, except as otherwise provided by Constitution, by statute, by these rules, or by other rules prescribed pursuant to statutory authority. Evidence which is not relevant is inadmissible." "Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex.R. Evid. 401.

The State argues that evidence of Weatherford's agreement to pay in connection with environmental contamination of the subject property is not relevant to determining that property's market value. The State contends this evidence is irrelevant because the State focused at trial on the effect that *delaying* development during the remediation period would have on a hypothetical purchaser's valuation of the subject property—not on the effect that *potential liability* for remediation and other expenses would have on a hypothetical purchaser's valuation. We reject this argument because the State's theory at trial was not so narrowly circumscribed as the State now suggests on appeal.

According to the State, its trial theory was that "the property's market value was affected by the cost of holding the property while environmental cleanup was completed and development was unlikely, not that market value would be affected by potential environmental liability and remediation costs." The record belies this contention. From voir dire through closing argument, the State addressed the impact of potential environmental liability on what a buyer would be willing to pay for the subject property.

The State opened its questioning of the venire by referring to contamination on the property: "[W]e expect the evidence to show that this land was heavily polluted, that it had contamination in its soil at levels of more than three times the levels allowed by the Texas Commission on Environmental Quality. . . ." The State referred to contamination entering the drinking water and the Texas Commission on Environmental Quality's inquiry into whether the plume of contamination was migrating. The State then observed:

> And that's why we intend to show that the price that someone would pay for this property, that a willing buyer will pay for this property, is substantially less than if the property were clean, and that's because a willing buyer, we expect the evidence will show, will not only be worried about what kind of pollution is in that soil, but what will be my responsibility to other landowners for this contamination.

Later, a venire member asked whether the property owner contributed to the pollution or knew about it. Counsel for the State replied that he had "to leave that up to the evidence," but the evidence would show that Weatherford was the main entity that released the pollution. After an additional exchange, another venire member who had business dealings with Weatherford expressed concern about whether Weatherford's activities had caused the pollution. The court then stated: "Ma'am, that's not going to be an issue in this case. Weatherford agreed that they caused it." This venire member did not serve on the jury.

In cross-examining Caffe Ribs's appraiser Robinson, the State elicited testimony that five of the six comparable properties

the appraiser used were not polluted but the subject property was polluted. The State had Robinson review a 2004 compilation of the chemicals of concern present in the subject property's ground water, eliciting his testimony about the extent to which levels of these chemicals exceeded the standards for residential drinking water. The State also cross-examined Robinson about the carcinogenic nature of five chemicals listed in a 1994 groundwater report.

The State further questioned Robinson about an article he had written in which he quoted another author on the subject of stigma associated with contaminated properties. Stigma was described as a "negative intangible" that is caused by "fear of hidden cleanup costs," "private liability," "public liability," and "[l]ack of mortgageabilty." The State's cross-examination of Robinson also addressed "other facets of stigma," including concerns about "deed recordation of contamination," "potential third-party litigation instigated by adjacent property owners," and the reluctance of lenders to "fund additional loans due to the unique nature of contamination and the remediation project." [4]

The State opened its cross-examination of Klein, the real estate developer, by eliciting his understanding that the subject property contained polluted soil, a plume of chlorinated solvent in the groundwater, and "chemicals of concern" on the date on which the State acquired it. The State then elicited Klein's testimony that he would "look into" whether a particular property had a plume of underground solvents or chemicals under it, with two concerns being identification of the responsible party and a determination about whether the plume was migrating.

During its cross-examination of environmental engineer Bost, the State asked about contamination levels for each test well and elicited Bost's testimony about how these levels exceeded the approved level for drinking water. The State also asked about a 17–year cleanup occurring at another site where contamination migrated and neighboring residents filed a lawsuit.

In examining its own environmental engineer McMullan, the State elicited testimony that a carcinogen is "a chemical that leads to higher incidents of cancer." The State then elicited testimony that three of the five chemicals of concern found in the groundwater on the property in 2004 were either probable or known carcinogens.

During closing, the State argued:

"[Robinson's] opinion of value is directly contrary to what he said in those articles with regards to the fact that you've got to take into consideration contamination. You've got to take into consideration stigma.

You've got to take into consideration that you've got a file, a deed recordation down at the courthouse saying that the property's contaminated.

He also talked to you a little bit and admitted that there were carcinogens in the soil. There were contaminants that were potentially cancer causing. . . .

\*     \*     \*

What would a buyer do if a buyer came to this property and saw that it had an underground storage tank on it? What would a buyer do if that buyer found out, just as you-all have seen, that there was soil around that underground storage tank that was polluted, that was

---

4. Caffe Ribs's appraiser defined "stigma" as "a perception of a condition of a property that could cause a reduction in market price."

He did not conclude that a stigma was applicable to the subject property.

contaminated, that was contaminated in excess of the levels allowed by the TCEQ?

*    *    *

What would a buyer do if that buyer found out that the groundwater under this property was in a plume and that in that plume there was [sic] chlorinated solvents in excess of the levels allowed by the TCEQ? Would that discount the property? Yes, they would. They certainly would. Any reasonable buyer would.

The State emphasizes on appeal that its appraiser based his valuation on a discounted cash flow analysis involving the necessity of holding the property for eight years before developing it. However, the record demonstrates that the State's theory at trial went beyond delay in development. The State's case was infused with evidence and argument addressing a prospective buyer's concern for potential liability for injury to others, and liability for remediation costs, attributable to the presence of carcinogens and other environmental contamination on the subject property.

The admission of contamination evidence in this eminent domain proceeding is not challenged in this appeal. Therefore, we need not and do not decide the relevance of evidence addressing environmental contamination, potential liability for such contamination, remediation costs, or a third party's agreement to pay for remediation of such contamination in all cases addressing the market value of contaminated property that has been taken through eminent domain.[5]

■ We hold as follows: If a party relies upon admitted evidence relating to contamination and concerns about potential environmental liability in connection with determining the market value of contaminated property that has been taken through eminent domain, then the existence of a third party's agreement to pay costs associated with such contamination also is relevant and admissible in determining what a hypothetical buyer would pay to a hypothetical seller for that property. *See City of Harlingen v. Sharboneau,* 48 S.W.3d 177, 185 (Tex.2001) ("In Texas condemnation law, market value properly reflects all factors that buyers and sellers would consider in arriving at a sales price"); *cf. Heddin v. Delhi Gas Pipeline Co.,* 522 S.W.2d 886, 888 (Tex. 1975) (Fear is relevant to proof of damages when "there is a basis in reason or experience for the fear; . . . such fear enters into

---

**5.** The parties have not cited and we have not located Texas case law specifically addressing these issues in the context of eminent domain. Courts in at least 13 states have adopted varying approaches to determining the admissibility of evidence concerning environmental contamination of property taken in eminent domain proceedings and responsibility for remediation of that contaminated property. *See Moorhead Econ. Dev. Auth. v. Anda,* 789 N.W.2d 860, 877–884 (Minn.2010) (collecting cases). Facing an issue of first impression under Minnesota law, the Minnesota Supreme Court adopted a "modified exclusion approach" under which evidence of remediation costs is not admissible, but evidence of the reduction in value caused by stigma attributable to environmental contamination is ad-

missible. *Id.* at 883 ("[E]vidence of contamination of the property being taken can be admitted and considered, but only to the extent necessary to determine the value of the property 'as remediated'—namely, if there is any loss of value to the property due to the stigma of the contamination."); *see also 260 N. 12th St., LLC v. State of Wis. Dept. of Transp.,* 329 Wis.2d 748, 792 N.W.2d 572 (¶ 23) (Wis.Ct.App.2010) ("[W]e conclude that evidence of contamination and related remediation costs is admissible in eminent domain cases in Wisconsin. Environmental contamination and the need to remediate the contamination is relevant to fair market value and, therefore, it is relevant to a determination of just compensation ....") (citation and footnote omitted).

the calculations of persons who deal in the buying and selling of similar property; and ... [there is] [d]epreciation of market value because of the existence of such fear.").

On this record, Weatherford's indemnity obligation was relevant to stigma based on "fear of hidden cleanup costs," "private liability," "public liability," and "potential third-party litigation instigated by adjacent property owners;" to a prospective buyer's concern for its "responsibility to other landowners for this contamination," and, in the words of the State's closing argument, to the "discount" that "any reasonable buyer" would demand upon learning that "the groundwater under this property was in a plume and that in that plume there [were] ... chlorinated solvents in excess of the levels allowed by the TCEQ" *See Primrose Operating Co. v. Senn,* 161 S.W.3d 258, 263 (Tex.App.-Eastland 2005, pet. denied) (quoting appraiser's definition of stigma as "the resistance of the market place to the purchase" and "a margin that ... any purchaser of the property would like to have above the actual cost" of remediation; stigma attaches because "the cost to cure is generally imprecise and may cost more than expected").

Accordingly, we conclude the trial court abused its discretion in excluding evidence relating to the Environmental Remediation Agreement and Weatherford's indemnity obligation under that agreement.

## II. Was the exclusion of evidence harmful?

■ After reviewing the entire record, we cannot conclude that exclusion of the evidence was harmless. *See Interstate Northborough P'ship,* 66 S.W.3d at 220. The jury found the market value of the property to be $4.5 million, or $13.77 per square foot.[6] This amount was more than the State's valuations of the property as contaminated ($681,000) or clean and ready for development ($3,276,330). It was, however, considerably less than Caffe Ribs's evaluation of $9.9 million, premised on a conclusion the contamination had no effect on the market value of the property.[7]

■ Based on these valuations, the State contends any error in exclusion of evidence of the Agreement was harmless because "[t]he jury's verdict of $4,500,000, or approximately $13.75 per square foot, was within the range of testimony as if the property were unimpaired by any environmental conditions. The trier of fact has the discretion to award damages within the range of the evidence presented at trial." The State relies on cases analyzing the sufficiency of the evidence—not the effect of exclusion of evidence on the verdict. *See Lindgren v. Delta Invs.,* 936 S.W.2d 422, 425 (Tex.App.-Austin 1996, writ denied); *Howell Crude Oil Co. v. Donna Refinery Partners, Ltd.,* 928 S.W.2d 100, 108 (Tex.App.-Houston [14th Dist.] 1996, writ denied); *City of Houston v. Harris Cnty Outdoor Adver. Ass'n,* 879 S.W.2d 322, 334 (Tex.App.-Houston [14th Dist.] 1994, writ denied)

■ The existence of "some evidence" to support the verdict is not the test for harm in this context. Instead, a reviewing court examines the entire record and asks

---

6. An acre contains 43,560 square feet. The subject property therefore contains approximately 326,700 square feet. Robinson calculated the value of the property at $31.00 per square foot before subtracting for demolition costs.

7. The total of $13.77 per square foot also is less than the selling price for Caffe Ribs's least expensive uncontaminated comparable property ($19.25 per square foot) and the least expensive contaminated property ($24.00 per square foot).

whether the evidence at issue was directly related to the central issue in the case or whether the judgment turned on the excluded evidence. *See State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 874 (Tex.2009) (exclusion of evidence harmful because evidence was directly related to central issue in case, *i.e.*, value of condemned property); *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000) (challenge to evidentiary rulings usually requires complaining party to show judgment turns on particular evidence excluded or admitted and reviewing court must review entire record to make this determination). As discussed above, the emphasis during the State's case on a prospective purchaser's potential environmental liability underscores the importance of the excluded evidence.

Additionally, when the trial court's exclusion of evidence creates a false impression or unfairly skews the trial in favor of one party, reviewing courts have concluded the exclusion is harmful. *See, e.g., Durbin v. Dal–Briar Corp.*, 871 S.W.2d 263, 270–71 (Tex.App.-El Paso 1994, writ denied), *disapproved on other grounds by Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 & 372 n. 4 (Tex.2000); *Trans–State Pavers, Inc. v. Haynes*, 808 S.W.2d 727, 732–34 (Tex.App.-Beaumont 1991, writ denied); *W. Co. of N. Am. v. Grider*, 626 S.W.2d 923, 927–28 (Tex.App.-Fort Worth 1982, writ denied). The Supreme Court of Texas has allowed that evidence may be admissible to offset a false impression left by the opposing party's evidence. *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 906 (Tex.2000).

In the present case, the State exploited evidence of contamination on the property and the effect it might have on a prospective buyer. Excluding evidence of Weatherford's agreement to indemnify present and future owners of the property created a false impression that a potential buyer would have to shoulder the burden of addressing the contamination, including exposure to suit from neighboring property owners if the contamination were to migrate off the property. The State relied on this impression by suggesting—through questioning, evidence, and argument—that this threat would depress the property's market value for reasons independent of delay in development.

The State correctly observes that the trial court did not exclude all evidence of Weatherford's responsibility for remediation and remediation costs. However, the false impression is not overcome by a single glancing reference to Weatherford's responsibility during trial. As set forth above, Robinson referred once to the Weatherford Environmental Remediation Agreement on redirect; immediately after he did so, the trial court called the parties to the bench and this line of questioning ceased. The court subsequently warned Caffe Ribs that it was approaching a prohibited matter when it tried to elicit testimony from Klein on the issue. The court sustained the State's objection to Caffe Ribs's question to Bost about the responsible party.

Nor is this false impression cured by the admission of State's Exhibit No. 216, a chart providing the State's computation of the subject property's value as of August 25, 2005. The State notes that this chart listed "$0" as the annual cost of "Environmental Remediation & Monitoring" for the subject property from 2005 through 2012. Consistent with the trial courts evidentiary rulings, however, there is no discussion in the record of this figure in relation to Weatherford. In any event, inclusion of this figure in an exhibit does not address the evidence and argument discussed above relating to stigma or a potential purchaser's concern for liability to adjacent landowners.

For the preceding reasons, we hold that the trial court abused its discretion in excluding evidence of the Environmental Remediation Agreement while admitting evidence of contamination and that exclusion of the evidence was harmful. We therefore sustain Caffe Ribs's second issue.

### Conclusion

Having sustained Caffe Ribs's second issue, we reverse and remand for further proceedings consistent with this opinion. Given our disposition of the second and eighth issues, we do not address Caffe Ribs's remaining issues.