**Affirmed and Memorandum Opinion filed January 16, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-12-00401-CV

---

## CAFFE RIBS, INC., A UTAH CORPORATION, Appellant

## V.

## THE STATE OF TEXAS, Appellee

---

**On Appeal from County Civil Court at Law No. 3
Harris County, Texas
Trial Court Cause No. 839502**

---

## M E M O R A N D U M   O P I N I O N

Caffe Ribs, Inc. appeals from a judgment on a jury verdict awarding $4,914,480 in this eminent domain proceeding for the State's whole taking of a 7.5214-acre parcel of land and improvements (the "property"). Caffe Ribs challenges the trial court's evidentiary rulings in four issues. We affirm.

## Overview

This is the second appeal arising in connection with the State's acquisition of Caffe Ribs's property as part of the construction, reconstruction, maintenance, and operation of the highway system. In the first appeal, Caffe Ribs appealed from a judgment on a jury verdict valuing the acquired property at $4.5 million. *Caffe Ribs, Inc. v. State*, 328 S.W.3d 919, 921-33 (Tex. App.—Houston [14th Dist.] 2010, no pet.). This court reversed the first judgment and remanded for a new trial based on the erroneous exclusion of evidence relating to a prior owner's obligation to indemnify future owners for environmental liability and remediation costs to address contamination on the property. *Id.* at 921. On remand, a second jury valued the property at approximately $4.9 million; Caffe Ribs now challenges the second award on several grounds.

## Background

The property is located on Old Katy Road near the northwest intersection of Beltway 8 and Interstate Highway 10. *Id.* The property was used to manufacture and store oil field equipment beginning in 1955; over the next four decades, these activities resulted in environmental contamination. *Id.* From 1977 to 1988, Weatherford U.S., Inc. owned and used the property for drilling tool fabrication and repair. *Id.* Property improvements included a parts warehouse, assembly shop, display room, machine shop, and office. *Id.* The Paul Revere Variable Annuity Insurance Company foreclosed on the property in 1988, but Weatherford maintained operations at the property as a lessee until 1992. *Id.*

Weatherford requested a Phase I Site Assessment in June 1991 to determine the potential impact of hazardous materials on the property; Harding Lawson Associates performed the assessment and submitted its Phase I Site Assessment report on November 4, 1991. Thereafter, "[t]hree underground storage tanks were

2

removed from the property for Weatherford by Harding Lawson and that work resulted in a report prepared by Harding Lawson for Weatherford entitled 'Underground Storage Tank Closure'" dated December 31, 1991. Two monitoring wells also were installed on the property during the latter part of 1993; these monitoring wells were reportedly sampled in November 1993.

After volatile organic compounds were discovered in groundwater samples collected from a monitoring well in November 1993,[1] Paul Revere authorized Science & Engineering Analysis Corporation ("SEACOR") to perform a Phase II Environmental Assessment. SEACOR installed five monitoring wells, completed its field work in February, and submitted its report to Paul Revere on May 2, 1994.

The report stated that (1) analysis of soils retrieved during soil boring revealed a source area for petroleum distillates and Total Petroleum Hydrocarbons (as gasoline and as fuel oil); (2) volatile organic compounds were detected in the five installed groundwater monitoring wells; (3) volatile organic compounds exceeding current acceptable State standards include PCE, TCE, 1,1-DCE, 1,2-DCE, and vinyl chloride as well as Total Petroleum Hydrocarbons (as gasoline and as fuel oil); (4) lateral distribution of volatile organic compounds-impacted groundwater strongly suggest that this impacted groundwater is migrating off-site; (5) the magnitude of soil and groundwater contamination is not yet quantified; (6) several options for site closure and/or remediation are available within the current State regulatory framework; and (7) SEACOR recommended additional soil sampling, monitoring well installations, sampling, and aquifer testing to define the magnitude of contamination.

---

[1] "Tetrachloroethane (PCE), trichloroethene (TCE), vinyl chloride, and 1,1-dichloroethene (1,1-DCE) were detected at levels above current acceptable state and federal limits."

A Supplemental Phase II Environmental Assessment was conducted by SEACOR between October and December 1994. SEACOR filed a report in February 1995 which revealed concerns about (1) petroleum, petroleum products, and petroleum-like products found in a monitoring well; (2) soil contamination under the parts warehouse, maintenance assembly, and possibly on other portions of the property; (3) volatile organic compounds detected in monitoring wells drilled in several portions of the property; and (4) groundwater contamination.

Paul Revere sold the property to Caffe Ribs for $487,000 in February 1995. *Caffe Ribs*, 328 S.W.3d. at 921. Under the written agreement between Paul Revere and Caffe Ribs, it was "expressly understood and agreed that Buyer shall accept the conveyance of the Property in its present condition, 'AS–IS, WHERE–IS[.]'" *Id*. Caffe Ribs also agreed "to accept the conveyance of the Property subject to any presently known or subsequently discovered Hazardous Materials or Hazardous Materials Contamination." *Id*. Pursuant to this agreement, Paul Revere retained the exclusive right to (1) evaluate and analyze the property's environmental condition and to "take such action as it deems necessary or appropriate, in its sole discretion and expense with regard to the environmental condition of the property;" (2) have "unlimited, unconditional, and continuing access to the property for the purpose of performing the environmental analysis, evaluation and/or remediation of the property which seller in its sole discretion, deems is necessary or advisable to be performed;" and (3) "make the determination as to when the Environmental Work is complete."

Paul Revere and Weatherford executed an "Environmental Remediation Agreement" in March 1996 in which the parties (1) acknowledged that Paul Revere conveyed the property to Caffe Ribs; and (2) agreed to perform environmental work on the property. *Id*. at 921-22. The Environmental

4

Remediation Agreement further stated that: "The belief that environmental work may be necessary is based on certain environmental assessments previously performed . . . . The environmental assessments have detected certain Hazardous Materials Contamination on the Property. Paul Revere and Weatherford desire to cooperate in (i) completing certain environmental assessments, (ii) performing certain environmental remediation work, and (iii) allocating the costs for such as set forth in this Remediation Agreement and wish to evidence their agreements hereby." *Id.* at 922. Using information provided by a consultant, Paul Revere and Weatherford agreed to determine the extent of Weatherford's contribution to the property's contamination. Weatherford is responsible for remediation "to the extent of its proportional contribution to such contamination."[2] *Id.*

Weatherford hired Arcadis to conduct an investigation of soil and groundwater; Arcadis concluded its investigation in February 1997, and confirmed that there are volatile organic compounds in the soil and chemicals of concern in the groundwater exceeding the groundwater standards for industrial groundwater use. Arcadis prepared a Summary of Environmental Conditions for Weatherford in February 2000, which was filed with the Texas Natural Resource Conservation Commission when the property entered the Commission's Voluntary Cleanup Program in February 2000.

Arcadis sent a Site Investigation Report on behalf of Weatherford to the Commission on January 24, 2001. The Commission responded on March 29, 2001, providing numerous comments and requesting a written response from Weatherford. Among the other comments, the Commission requested that (1) Weatherford's next report "should be an Affected Property Assessment Report

---

[2] By January 2005, the State had executed its own "Remediation and Indemnity Agreement" with Weatherford International, Inc. *Id.*

5

(APAR) which should include Protective Concentration Limits (PCLs) of each of the chemicals of concern (COCs) at the site" and should evaluate scenarios for exposure to chemicals of concern; (2) the horizontal and vertical extent of contamination in the groundwater and soil at specific locations on the property be delineated; and (3) more monitoring wells to investigate groundwater be installed.

On July 29, 2003, Arcadis submitted a Groundwater Sampling Event report on behalf of Weatherford to the Texas Commission on Environmental Quality (TCEQ).[3] The report contained the results of groundwater samples collected in March 2003 from existing monitoring wells regarding the presence of chemicals of concern. The report indicated that detailed data had been collected regarding the concentration of chemicals of concern impacting groundwater at the site; but it also indicated that there had been limited biogeochemical data collected at the site; and that more data would aid a better evaluation of the natural attenuation processes[4] occurring on the property. The report further indicated that some time in 2001 contaminated soil was excavated and removed to an off-site location.

Weatherford submitted the first Affected Property Assessment Report on December 15, 2003, to the TCEQ. In response to Weatherford's Groundwater Sampling Report and Affected Property Assessment Report, TCEQ project manager Vince Rorick sent a letter containing numerous comments to Weatherford and requested a written response to each comment. The TCEQ, among others, expressed (1) disagreement with Weatherford's groundwater classification; (2) the need for further soil investigation; and (3) the need to define and delineate the

---

[3] The name of the Texas Natural Resource Conservation Commission changed to the Texas Commission on Environmental Quality (TCEQ). For the sake of simplicity, we will refer to the Texas Natural Resource Conservation Commission and the Texas Commission on Environmental Quality collectively as TCEQ.

[4] Natural attenuation refers to remediation of contaminated property by allowing the concentration of contamination to decrease naturally without active intervention.

horizontal and vertical plume of chemicals of concern. Weatherford submitted a revised Affected Property Assessment Report and Response Action Plan (RAP) to the TCEQ on October 28, 2004, but the TCEQ did not approve these documents.

At some point in 2004, the State announced its plan to build a detention pond on the property as part of its highway development. On May 27, 2005, the State filed a petition seeking to condemn the property. *Caffe Ribs*, 328 S.W.3d. at 922. A Special Commissioners Hearing was held on July 19, 2005; Caffe Ribs, Paul Revere, Houston Community College, Spring Branch Independent School District, Harris County, and the City of Houston jointly were awarded $7,372,000 in damages for the condemnation of the property. *Id*. Caffe Ribs and the State filed objections to the Special Commissioners' award, and the administrative proceeding was converted into a civil case. *Id*.

On August 25, 2005, the State deposited the Special Commissioners' award into the court's registry. *Id*. On May 15, 2006, the county civil court at law granted a request by Caffe Ribs and Paul Revere to withdraw the Special Commissioners' award. *Id*. According to the order, Caffe Ribs was allowed to withdraw $6,459,500 from the court registry, and Paul Revere was allowed to withdraw $912,500. *Id*.

The jury returned a unanimous verdict on August 22, 2007, finding the property's fair market value to be $4,500,000 on August 25, 2005 — the date of taking. *See id*. at 925. The trial court signed a final judgment on September 24, 2007, in conformity with the jury's verdict; based in part on Caffe Ribs's prior withdrawal of $6,459,500, the trial court ordered Caffe Ribs to pay the State $2,872,000. *See id*.

Caffe Ribs appealed and contended that the trial court erred by allowing the State to argue that market value would be significantly affected by potential

7

environmental liability and remediation costs while simultaneously preventing Caffe Ribs from demonstrating the existence of an agreement by which Weatherford agreed to indemnify subsequent owners for such liability. This court agreed with Caffe Ribs and held that the trial court abused its discretion in excluding evidence of the environmental remediation agreement while admitting evidence of contamination. *Id*. at 933.

On remand, a jury trial was held from October 12, 2011 to October 25, 2011. Caffe Ribs presented testimony at trial from Caffe Ribs's president Tom Mackey Barnes, commercial real estate developer David Klein, environmental engineer Richard Bost, former TCEQ project manager Vince Rorick, and appraiser Rudy Robinson.

Barnes opined that the property had a value of $10 million at the time of taking. He acknowledged that Weatherford and Paul Revere would be responsible for any costs associated with remediation of the property, and that they had the right to unlimited, unconditional, and continuing access to the property for the purpose of remediation. Barnes agreed that Caffe Ribs had in effect given an easement to Paul Revere and Weatherford "for an unlimited time period to come on [its] property and perform their clean-up activities."

Klein testified about factors relevant to developing real estate. He opined about several favorable qualities of the property — in particular, its location. On cross-examination, the State elicited Klein's testimony that, if he were looking at the subject property for purchase and development, he would be concerned with whether (1) there was no approved Affected Property Assessment Report and Response Action Plan; (2) there was a contaminated plume; (3) the edges of the plume were not delineated; (4) there might not be sufficient monitoring wells on the property; (5) the party responsible for cleaning up the contamination "had not

8

done a great deal of work over the years" to clean up; (6) the plume was migrating; (7) there were health risks; (8) the property could be resold considering its contamination; and (9) the property had a fault line.

Bost testified about the property's environmental and remediation status. He explained that monitoring wells had been installed on the property to determine whether the plume was stable, decreasing, or increasing. He testified that all known soil contamination had been remediated, although he later acknowledged that additional contamination was found when the State removed structures after the date of taking. He also testified about the levels of groundwater contamination; he opined that the sources of groundwater contamination had been removed and the plume was stable. Bost opined that a fault line on the property had no significant effect on the environmental condition of the property. He also opined that the amount of contamination on the property was innocuous.

During cross-examination, the State questioned Bost about contamination levels for each monitoring well on the property and elicited testimony that the contamination levels measured at several wells exceeded the approved level for drinking water; that contamination had increased in some places between 2001 and 2003; and that chemicals of concern had migrated in one area from the property to neighboring property. Bost acknowledged that the TCEQ had not approved Weatherford's December 2003 or October 2004 Affected Property Assessment Reports and had not issued a conditional certificate of completion for the property. Bost also acknowledged that in a 2004 letter addressed to Weatherford, the TCEQ had required Weatherford to delineate the plume vertically and horizontally because it had not done so yet.

On redirect, Bost testified that the contamination levels measured at the monitoring wells "go up and down" but, for practical purposes, there had been no

change in the groundwater contamination levels, meaning the groundwater plume was stable. He also opined that a contamination level reading that exceeds two to three times the approved level for drinking water does not require remediation.

Rorick testified that he was the project manager in charge of overseeing the cleanup of the property. Rorick opined that a conditional certificate of completion could have been obtained for the property by the taking date. He stated that he did not usually require properties to reach drinking water standards to obtain a conditional certificate of completion under the Voluntary Cleanup Program. He opined that there was not a lot of contamination on the property at the time of the taking.

On cross-examination, Rorick agreed that an Affected Property Assessment Report and Response Action Plan had to be approved by the TCEQ before a conditional certificate of completion could be obtained. Rorick acknowledged that the TCEQ had not approved the two Affected Property Assessment Reports and the Response Action Plan Weatherford had submitted during 2003 and 2004 because the Affected Property Assessment Reports were incomplete and Weatherford had not delineated the plume vertically and horizontally. He acknowledged that the property had not obtained a conditional certificate of completion because the plume had not been delineated. The State elicited Rorick's testimony that obtaining a conditional certificate of completion was dependent on a determination that there were no chemicals of concern in the deepest groundwater-bearing zone of concern, and that it would not be unreasonable for the certificate process to take five to eight years if chemicals of concern were found in that zone. Rorick testified that he assumed the use of active remediation as contrasted with natural attenuation — the main method Weatherford had used to remediate groundwater contamination on the property since the 1990s.

Robinson opined that the property is unique and desirable because of its location and access, among other factors. Robinson opined that based on the comparable sales appraisal method, considering six land sales, the unimpaired or uncontaminated property value was $9,900,000 at the time of the taking. He also concluded that the property's environmental condition did not warrant an adjustment in market value.

On cross-examination, the State challenged Robinson's selection of several of his comparable sales. One of the comparable sales was in Dallas; one had a Response Action Plan in place and chemicals of concern below the State mandated protective concentration limits; and two had obtained closure under the Voluntary Cleanup Program. The State also elicited Robinson's testimony that he rendered opinions in the past "that having chemicals of concern or contamination that are above the levels allowed by the TCEQ lowers the market value of property."

The trial court excluded any evidence that the State's announcement of a detention pond project in connection with highway reconstruction interfered with and delayed the property's remediation. Caffe Ribs made bills of exception regarding any testimony it would have elicited from Bost and Rorick with respect to the State's alleged interference with the remediation.

The State presented testimony from environmental engineer Ashby McMullan, appraiser David Dominy, and appraiser Albert Allen. Both parties also presented evidence regarding agreements addressing Weatherford's and Paul Revere's respective remediation responsibilities.

McMullan testified about the property's environmental and remediation status. McMullan testified that the plume was discovered in 1994, and the environmental assessment report documented that chemicals of concern had been found on the property. He explained that the groundwater plume had not been

11

delineated horizontally or vertically on the date of the taking. He also explained that without delineating the plume, Weatherford cannot assess the contamination and thus cannot create a proper remediation plan. McMullan testified that Weatherford's two Affected Property Assessment Reports and the Response Action Plan were not approved by the TCEQ, and Weatherford never obtained a conditional certificate of completion. McMullan testified that readings from several monitoring wells showed that chemicals of concern in the groundwater had increased by the date of taking; readings showed that chemicals at one well were "410 times greater than the drinking water standard."

McMullan explained that the most common method to clean up the type of contamination found on the property is natural attenuation, and to clean up a plume like the one on the property would take at least 40 to 50 years. McMullan explained that a more expensive cleanup method is active remediation, or "pump and treat," which would cost up to $500,000 a year and would take about ten years. He said this length of time would be required because the specifics of the plume are unknown and the TCEQ would require the owner to pump and treat until drinking water standards were met. He opined that active remediation is very unusual and "most clients don't want to implement it now because of the cost involved."

He further opined that, "based on the information that [he has] learned in this case and based on a reasonable probability," it would take eight years from the taking date to obtain a conditional certificate of completion from the TCEQ because four tasks needed to be accomplished: (1) assessment of the property and completion and approval of an Affected Property Assessment Report; (2) completion of the Response Action Plan; (3) implementation of the Response Action Plan; and (4) request for closure. He explained that between 1991 and

12

2005, "there has been some cleanup work done, but there's quite a bit remaining; and you really can't know what's remaining until you find out how much material is affected. They've got quite a bit of work ahead of them."

McMullan clarified on cross-examination that his eight-year estimate was based on groundwater and not soil contamination. He acknowledged that "if you had a party that was implementing an aggressive response action and really had the approach that cost was no object, it would be possible to get a certificate in two years."

Dominy opined that the unimpaired property value was $3,276,330 at the time of taking based on the comparable sales appraisal method. Dominy disagreed with Robinson's views on the property's desirability, location, and access. Dominy testified that in determining the property's impaired value he ascertained the extent of the property's contamination. He testified that he considered: (1) the absence of an approved Affected Property Assessment Report or Response Action Plan; (2) the remediation activity on the property between 1991, when contamination had been discovered, and 2005, and the fact that Weatherford had not delineated the plume and defined the extent of the contamination during this time period; (3) the remediation agreement with Weatherford and Paul Revere, which provided no financial motivation for the responsible party to conduct remediation "in a timely fashion" and "established effectively a blanket easement on the property that had a lack of a time frame associated with cleaning up the property and to what extent it would be cleaned up;" (4) documents from the TCEQ; (6) McMullan's report; and (7) documents from Arcadis. Dominy concluded that it would take eight years to obtain regulatory closure.

Dominy testified that he also conducted a market survey to determine how the market would react to the property's environmental status and the lack of a

conditional certificate of completion; he concluded that the property most likely would not be developed while undergoing remediation. Dominy therefore used a discounted cash flow analysis to account for the costs associated with holding the property for eight years until a conditional certificate would be obtained. Dominy concluded that the impaired property value was $681,251 at the time of the taking.

On cross-examination, Caffe Ribs challenged Dominy's comparable sales analysis as well as his application of the discounted cash flow analysis to determine the property's value. Caffe Ribs elicited Dominy's testimony that, if the eight-year time frame to remediate the property and obtain a conditional certificate of completion were incorrect, then his discount rate would "need to be changed accordingly for that time frame." Dominy further stated that his final conclusion on the property's value would remain the same; only a time adjustment in his discounted cash flow analysis would be required.

Allen testified via deposition that he had appraised the property as unimpaired for the Special Commissioners Hearing, and that he would have to analyze the property as impaired to accurately state the property's fair market value.

The jury was asked in a single question to determine the "market value" of the property "including improvements thereon, condemned for highway purposes on August 25, 2005, valued as a fee simple estate." The term "market value" was defined as the "price which the property would bring when it is offered for sale by one who desires, but is not obliged to sell, and is bought by one who is under no necessity of buying it, taking into consideration all of the uses to which it is reasonably adaptable and for which it either is or in all reasonable probability will become available with[in] the reasonable future."

In making its determination of market value, the jury also was instructed to

14

consider the "highest and best use" of the property. "Highest and best use" was defined as the "reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." The jury further was instructed that the "four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility and maximum profitability."

The jury returned a unanimous verdict finding that the property had a market value of $4,914,480 on August 25, 2005. The trial court signed a judgment on January 23, 2012, in conformity with the jury's verdict; based on a credit and offset taken, the trial court ordered Caffe Ribs to pay the State $2,447,868. Caffe Ribs filed a motion for new trial on February 22, 2012. The trial court denied Caffe Ribs's motion for new trial on May 2, 2012. Caffe Ribs timely appealed.

## Standard of Review

All of Caffe Ribs's appellate issues focus on the trial court's evidentiary rulings at the second trial. Determining whether to admit or exclude evidence lies within the trial court's sound discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). A trial court exceeds its discretion if it acts in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). When reviewing matters committed to the trial court's discretion, a court of appeals may not substitute its own judgment for the trial court's judgment. *Id.* An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *see Enbridge Pipelines (E. Tex.) L.P. v. Avinger Timber*, LLC, 386 S.W.3d 256, 264 (Tex. 2012).

15

With respect to expert testimony, the trial court must act as an evidentiary gatekeeper to exclude irrelevant and unreliable expert evidence. *Enbridge Pipelines*, 386 S.W.3d at 262. It has broad discretion with respect to this function. *Id*. In determining whether an abuse of discretion occurred in the inclusion of an expert's testimony, we look to see whether the trial court acted without reference to guiding principles or rules. *See id.*

To reverse a judgment based on a claimed error in admitting or excluding evidence, a party must show that the error probably resulted in an improper judgment. Tex. R. App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220. In determining whether the excluded or admitted evidence probably resulted in the rendition of an improper judgment, we review the entire record. *See Interstate Northborough P'ship*, 66 S.W.3d at 220. Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Id*. This Court ordinarily will not reverse a judgment because a trial court erroneously excluded evidence when the evidence in question is cumulative and not controlling on a material issue dispositive to the case. *Id*.

**Analysis**

**I.    Exclusion of Alleged Interference Evidence**

**A.    Error in Excluding Evidence**

In its first issue, Caffe Ribs argues that the trial court abused its discretion by excluding "abundant evidence" that the State's project to construct a detention pond delayed Caffe Ribs's remediation of the property and Caffe Ribs's ability to achieve a certificate of completion from the TCEQ for remediation of the property. Caffe Ribs says this was error because (1) the most hotly contested issue at trial

was the timing of issuing a conditional certificate of completion for remediation; and (2) delay in completing remediation was the sole premise for the State's appraisal expert's assumption that remediation would take eight years, thereby delaying sale and development during that period. According to Caffe Ribs, this evidence should not have been excluded because (1) it was relevant to show that the State was to blame for any delay in remediation and Caffe Ribs's inability to obtain a certificate of completion; (2) a property owner should not be penalized for State conduct that impairs the value of the property, and the jury should be allowed to consider whether the State's condemnation activities resulted in a diminution of market value; and (3) the doctrine of project influence is not a valid basis for excluding evidence that the State's conduct has impaired the property's market value.

Caffe Ribs contends that project manager Rorick would have testified that the State's pond project injected new remediation requirements and interfered with and delayed remediation of the property, and that, but for the State's interference, the property would have obtained a certificate of completion by the date of the taking. Caffe Ribs therefore complains that the following affidavit testimony[5] by Rorick was excluded improperly:

\*             \*             \*

2.     There is no TCEQ restriction requiring closure before development of a property.

3.     At the time that I received the 2003 ARCADIS [Affected

---

[5] Before offering Rorick's affidavit testimony, Caffe Ribs complied with the trial court's request to orally summarize the proffered testimony, stating as follows: "Mr. Rorick would have testified starting in 2004 when he was told about the State's project, he started making changes in his requirements from the remediation of the property and determined based upon State's project that remediation steps would have to be delayed because the wells were going to be ripped out, have to wait until the end of construction, and then have to be replaced later. He would testify that the State's project did delay the remediation."

Property Assessment Report], remaining tasks for Certificate of Completion, Conditional Certificate of Completion could have been completed in two years contingent upon a representative sample from the deeper groundwater zone, below the PCL's for the chemicals of concern.

4.     As of 2004, Letter of Closure for Soils could have been achieved in one year.

5.     As of 2004, the property could have received a Conditional Certificate of Completion on water within one year, assuming that the [Voluntary Cleanup Program] Agreement had been aggressively pursued.

6.     The State raised the issue of the detention pond construction plan with TCEQ staff prior to 2005.

7.     Deed recordation of a Conditional Certificate of Completion would not likely have caused a material limitation on development of the property.  Other properties with plumes of chlorinated solvent identified in the groundwater, in the Houston area, with no direct receptors have been developed upon receipt of a Conditional Certificate of Completion.

8.     I was contacted by TxDOT[6] personnel and informed of the IH-10 project, which included plans for construction of a detention pond on the subject parcel.  I routinely communicated with Ms. Deborah Lively of TxDOT on this matter.

9.     Revelation of TxDOT's project involving the detention pond did affect timing of the administrative process and the pending [Voluntary Cleanup Program] agreement, causing delay.

10.     Revelation of TxDOT's project involving the detention pond did increase my concerns relating to delineation of the plume.

11.     Revelation of TxDOT's project involving the detention pond did result in delays relating to the pending [Voluntary Cleanup Program] Agreement.

12.     Attached is a letter[7] from me, which is a true and correct copy of an official TCEQ record, kept in the normal course of business and

---

[6] TxDOT stands for Texas Department of Transportation.

[7] There is no letter attached to this affidavit in the record.

18

was drafted in my official capacity as TCEQ employee. I wrote the letter, after revelation of the detention pond project. The letter reflects requests and recommendations made after learning of the detention pond project, that included consideration of the impact of that project.

13.     But for the change in proposed use to a detention pond, and the resulting delays, the property was on course to become eligible for a *Conditional Certificate of Completion* with only typical additional monitoring or possibly remediation activities and reporting, contingent upon a representative sample from the deeper groundwater zone, below the PCL's for the chemicals of concern.

Caffe Ribs also points to a bill of exception summarizing testimony that environmental engineer Bost would have given at trial. Caffe Ribs complains that the trial court improperly excluded the proffered testimony:

THE COURT: If you want to make a bill, give me a summary of what you think he would say.

### BILL OF EXCEPTION

CAFFE RIBS: Mr. Bost would say, if he were allowed to testify, that at around 2004 when the State told the TCEQ that this property was going to be used as a detention pond, that changed from the comments and questions and requirements for the TCEQ's remediation of this property, moreover, because it was removing the existing well network and requiring placement of other wells. The TCEQ had said, hey, you can't do this until after the State's detention pond project is done. Therefore, when the State is saying, hey, you didn't get it done by the date of taking, Mr. Bost would say there was delay caused by the project.

Caffe Ribs incorrectly asserts that the trial court excluded "abundant evidence" that the State interfered with and delayed Caffe Ribs's remediation of the property.[8]

---

[8] In its appellate brief, Caffe Ribs also quotes evidence allegedly contained in "remediation reports" that shows "how the State caused the remediation to be delayed on the property," but Caffe Ribs does not provide citations where this evidence can be found in the record. Caffe Ribs cites to a second supplemental clerk's record; the record does not contain a second supplemental clerk's record, nor have we been able to locate this evidence in the large record before us. Accordingly, we do not consider what Caffe Ribs has quoted as "evidence" contained in "remediation reports." *See* Tex. R. App. P. 38.1; *see also Allegiance Hillview, L.P.*

Caffe Ribs also incorrectly asserts that the property would have obtained a certificate of completion by the date of the taking but for the State's interference.

Rorick did not state how long the State's detention pond project delayed the certificate, nor did he state that Caffe Ribs would have received a conditional certificate of completion but for the State's project. Rorick stated in his affidavit that the property could have received as of 2004 a conditional certificate of completion "on water within one year, assuming that the [Voluntary Cleanup Program] Agreement had been aggressively pursued." There is no evidence in this record that Weatherford considered aggressively pursuing remediation of the property; nor would the remediation history of the property support such an inference. Rorick also stated in his affidavit that the property was "on course to become eligible" for a conditional certificate of completion "contingent upon a representative sample from a deeper groundwater zone" reflecting that chemicals of concern are below protective concentration limits; Rorick did not state that, but for the State's project, the property would indeed have obtained a conditional certificate of completion by the date of the taking.

Caffe Ribs's proffered testimony of Bost by bill of exception also does not constitute evidence establishing that the property would have obtained a certificate of completion by the date of the taking but for the State's interference.

It is thus unclear how the excluded evidence would have been relevant in this case when it does not support Caffe Ribs's chief assertions that (1) the State's conduct impaired the property's market value because the State's project delayed remediation and foreclosed a certificate of completion; and (2) these circumstances were the basis for State appraiser Dominy's discounting of the property's value.

---

*v. Range Tex. Prod., LLC*, 347 S.W.3d 855, 873 (Tex. App.—Fort Worth 2011, no pet.).

20

Nonetheless, even assuming that the trial court abused its discretion by excluding the complained-of evidence, Caffe Ribs still must show that the error was harmful. *See* Tex. R. App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220. We proceed to address Caffe Ribs's second issue, in which it contends that a new trial is required because (1) "the exclusion of evidence on an issue central to the case is harmful, particularly where the opposing party has emphasized the type of evidence excluded;" and (2) harmful error is presumed when a party exploits the exclusion of evidence to create a false impression with the jury. We will address each of Caffe Ribs's contentions in turn.

## B.     Harmful Error in Excluding Evidence

Caffe Ribs contends that the State emphasized Caffe Ribs's failure to achieve a certificate of completion throughout the trial from opening to closing statement. Caffe Ribs further contends that "this issue was the sole basis for Dominy's opinion testimony on the eight-year delay in development of the property, which resulted in his heavy discounting of the property's value." Caffe Ribs claims that "[w]ith this type of emphasis, the exclusion of evidence relating to the State's interference in the remediation process was harmful error."

Having reviewed the entire record before us, we disagree with Caffe Ribs that exclusion of the complained-of evidence constituted harmful error. Caffe Ribs overstates the State's alleged emphasis and the number of times the State mentioned or elicited evidence that the Caffe Ribs property had not obtained a conditional certificate of completion at the time of the taking. At trial, the State elicited testimony and emphasized the uncertain environmental status of the property. The State also emphasized the failure to delineate the plume even though the responsible party for remediation, Weatherford, had (1) known about the contamination since the early 1990s; and (2) been instructed by the TCEQ in 2001

21

and 2004 to delineate the plume vertically and horizontally.  Evidence established that the plume had not been delineated between the time the contamination was first discovered in the early 1990s and the date of the taking in August 2005.  Evidence also established that (1) an Affected Property Assessment Report and Response Action Plan would not be approved by the TCEQ; and (2) a conditional certificate of completion could not be obtained without delineation of the plume.

Caffe Ribs incorrectly asserts that the "failure of Caffe Ribs to have achieved a certificate of completion" was the "sole basis for Dominy's opinion testimony on the eight-year delay in the development of the property."  Dominy testified that as part of his analysis as an appraiser he conducted a market survey to determine how the market in 2005 would have reacted to the property's environmental status.  The survey provided the property's history and location.  It asked lenders and investors/developers if they would have financed or developed the property on August 25, 2005, if (1) the property had been in the same environmental condition it had been in at the time of the taking; (2) the TCEQ had approved a Response Action Plan; (3) the TCEQ had issued a conditional certificate of completion; or (4) the TCEQ had issued a letter of no further action.  Based on the survey answers, Dominy concluded that the market most likely would not have supported development of the property while it was undergoing remediation.  Therefore, Dominy used a discounted cash flow analysis to account for the costs associated with holding the property for eight years pending remediation.

Dominy based his conclusion that it would take eight years to remediate the property and achieve regulatory closure on the following considerations: (1) Weatherford had not delineated the plume and defined the extent of groundwater contamination between 1991 — when contamination of the property had first been

22

discovered — and the time of the taking in 2005; (2) the limited remediation activity on the property between 1991 and 2005; (3) the fact that the TCEQ had not approved any Affected Property Assessment Report and no Response Action Plan was in place; (4) the remediation agreement with Weatherford and Paul Revere, which provided no financial motivation for the responsible party to conduct remediation more swiftly and effectively imposed an unlimited blanket easement associated with the cleaning up of the property; and (5) documents from the TCEQ and Arcadis as well as McMullan's report.

Exclusion of the complained-of evidence could not have been harmful in any event because there is no basis in this record for Caffe Ribs's assertion that the State was to blame for the property not receiving a conditional certificate of completion.

The Bost testimony proffered by bill of exception provides no support for assigning blame to the State's pond project for the absence of a conditional certificate of completion by the date of the taking. Rorick's affidavit does not establish that the State's pond project was to blame for the inability to obtain a certificate. According to Rorick, the property was merely "on course to become eligible for" a conditional certificate of completion "contingent upon a representative sample from the deeper groundwater zone, below the PCL's for the chemicals of concern."

Caffe Ribs contends that "harmful error is presumed where a party exploits the exclusion of evidence to create a false impression with the jury." According to Caffe Ribs, the State was able to "exploit the evidentiary rulings to create a false impression regarding the status of remediation." Caffe Ribs complains that the State "[t]ime and time again was able to emphasize that Caffe Ribs had not achieved a certificate of completion from the TCEQ" while Caffe Ribs was not

allowed to "put on any rebuttal evidence demonstrating that the State's project had precluded a completion of the remediation process and had required completion of additional steps."

Caffe Ribs's argument is without merit because there is no basis for concluding that the State created a false impression (1) regarding the remediation status of the property; or (2) that "Caffe Ribs did not and could not have completed remediation." Therefore, there was no false impression that admission of Bost's and Rorick's excluded testimony could have corrected. And, contrary to Caffe Ribs's assertion, none of the excluded interference evidence demonstrates that "the State's project had precluded a completion of the remediation process and had required completion of additional steps."

Rorick did not state in his affidavit how long the State's detention pond project delayed the process, or that the project "required completion of additional steps." Rorick did not state that the State's project precluded completion of the remediation process. Rorick stated that the property was "on course to become eligible" for a conditional certificate of completion "contingent upon a representative sample from a deeper groundwater zone" reflecting that chemicals of concern are below protective concentration limits. Rorick did not state that, but for the State's project, the property would have obtained a conditional certificate of completion by the date of the taking.

Caffe Ribs's proffered Bost testimony also does not establish that the State's project (1) precluded "completion of the remediation process" on the Caffe Ribs property; or (2) "required completion of additional steps" so that a conditional certificate of completion for the property would have been obtained from the TCEQ by the date of the taking.

The record contains evidence that (1) contamination was first discovered on

24

the Caffe Ribs property in 1991; (2) Weatherford had not delineated the plume and defined the extent of the contamination on the property between 1991 and the date of the taking in 2005; and (3) after Weatherford entered the TCEQ's voluntary cleanup program in 2000, it was told by the TCEQ in 2001, and again in 2004, that it needed to delineate the plume and show that chemicals of concern exceeding protective concentration limits were not present in the property's deeper groundwater zone.

Even if the trial court abused its discretion in excluding Bost's and Rorick's proffered testimony, the exclusion was harmless. Accordingly, we overrule Caffe Ribs's first and second issues.

## II.    Exclusion of Special Commissioners Hearing Testimony and Appraisal

Caffe Ribs argues in its third issue that, "[c]ontrary to the controlling *Speedy Stop* decision, the trial court erred in excluding the State's written and oral admissions on fair market value in a judicial proceeding, while still allowing the State to challenge those admissions without rebuttal evidence." *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846 (Tex. 2011) (holding, in a condemnation proceeding, that trial court abused its discretion when it excluded an expert's appraisal of property and prior testimony before the special commissioners, which the high court concluded were not hearsay because they were admission by a party-opponent).

According to Caffe Ribs, the State argued at the Special Commissioners Hearing that the property was valued $6,880,000 despite the contamination. This valuation rested on the opinion expressed by Albert Allen, the appraiser for the State at the hearing.

Relying on *Speedy Stop*, Caffe Ribs contends that the State's "position is an

25

admission, and even the appraisal from the expert sponsored by the condemning authority is admissible against the condemning authority as an admission." Caffe Ribs contends that, "[a]lthough the trial court permitted a few brief cursory remarks as to the amount of value, the admissions themselves (the appraisals and the statements to the commissioners) were [erroneously] not admitted into evidence to establish the substance of what was claimed and why." According to Caffe Ribs, the State was permitted to criticize Allen's appraisal and to "disclaim the anticipation of environmental problems with the property while making those representations, when the documents and statements that constituted the admissions would have rebutted those assertions." We presume for the sake of argument that the trial court erred as asserted by Caffe Ribs.

Even if the trial court erred by excluding Allen's complete Special Commissioners Hearing testimony and appraisal, Caffe Ribs has not demonstrated that it was harmed. *See* Tex. R. App. P. 44.1(a)(1); *Interstate Northborough P'ship*, 66 S.W.3d at 220. Having reviewed the entire record in this case, we conclude that Caffe Ribs cannot make such a showing.

Caffe Ribs asserts that the trial court allowed the State to challenge Allen's appraisal without allowing rebuttal evidence from Caffe Ribs. Nonetheless, in its opening statement, Caffe Ribs pointed to the $6,880,263 valuation. Caffe Ribs repeatedly elicited testimony during trial that Allen had appraised the property for the Special Commissioners Hearing at $6,880,000. Caffe Ribs also elicited evidence regarding the content of and basis for Allen's appraisal as well as the recommendations Allen made in his appraisal. Both Caffe Ribs and the State elicited evidence that Allen appraised the property as unimpaired.

The State called Allen to testify at trial via deposition that (1) he had appraised the property as unimpaired as instructed by the State; (2) it is the State's

26

policy when making an initial acquisition offer to appraise a property as unimpaired but to indicate in the appraisal that it is contaminated; and (3) he would have to analyze the property as impaired to accurately state the property's fair market value. Caffe Ribs presented Allen's deposition cross-examination. Caffe Ribs asked Allen detailed questions about his appraisal, the appraisal process in particular, and background information he considered about the property; Caffe Ribs also asked Allen's opinion with respect to the property's highest and best use, location, and development opportunities at the time of his appraisal in 2005.

Thus, the record does not support Caffe Ribs's assertion that the trial court allowed the State to challenge Allen's appraisal without allowing rebuttal evidence from Caffe Ribs. Additionally, Caffe Ribs again discussed Allen's appraised property value of $6,880,000 during its closing statement.

We conclude that Caffe Ribs cannot show that the trial court's alleged error in excluding Allen's complete appraisal and hearing testimony was harmful. Therefore, we overrule Caffe Ribs's third issue.

## III. Admission of Expert Testimony

Caffe Ribs contends in its fourth issue that the appraisal opinions of State's appraisal expert David Dominy were unreliable and inadmissible because (1) Dominy made improper assumptions; (2) there was no support for Dominy's use of a discount rate "on top of a comparable sales approach, and Dominy made assumptions that contradicted his own stated method;" and (3) Dominy's opinion under the comparable sales method for unimpaired property was tainted by speculation and improper assumptions.

Appraisal expertise is a form of "'specialized knowledge [used to] assist the trier of fact to determine a fact in issue.'" *Guadalupe–Blanco River Auth. v. Kraft*,

27

77 S.W.3d 805, 807 (Tex. 2002) (quoting Tex. R. Evid. 702). An expert's testimony is admissible, when the opinion is relevant and based upon a reliable foundation. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 628 (Tex. 2002); *see* Tex. R. Evid. 702. Caffe Ribs does not challenge Dominy's qualifications or argue that Dominy's testimony is irrelevant; thus, we focus on reliability.

Texas Rule of Evidence 702's reliability requirement centers on the principles, research, and methodology underlying an expert's conclusions. *Zwahr*, 88 S.W.3d at 629. "Under this requirement, expert testimony is unreliable if it is not grounded 'in the methods and procedures of science' and is no more than 'subjective belief or unsupported speculation.'" *Id*. (quoting *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995)). If an expert relies upon unreliable foundational data, any opinion drawn from that data likewise is unreliable. *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001) (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997)). Expert testimony also is unreliable if "there is too great an analytical gap between the data the expert relies upon and the opinion offered." *Zwahr*, 88 S.W.3d at 629. An expert's opinion may be unreliable if it is based on assumed facts that vary from the actual facts. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009).

In applying this reliability standard, the trial court does not decide whether the expert's conclusions are correct; rather, the trial court determines whether the analysis used to reach those conclusions is reliable. *Zwahr*, 88 S.W.3d at 629. If an appraiser utilizes improper methodology or misapplies established rules and principles, then the resulting testimony is unreliable and must be excluded. *Id*. at 631. In cases involving specialized but non-scientific testimony, such as involved here, it is impossible to set out specific criteria for evaluating the reliability of expert testimony; ultimately, the trial court has discretion to determine how to

28

assess reliability.  *See Weingarten Realty Investors v. Harris Cnty. Appraisal Dist.*, 93 S.W.3d 280, 285 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

## A.     Improper Assumptions Argument

Caffe Ribs contends that the trial court abused its discretion by allowing Dominy to testify at trial because he improperly assumed that the property likely would not be developed for eight years pending remediation and receipt of a certificate of completion.  Caffe Ribs contends that Dominy "admits he has no opinions or competency to address what can be done to sell or develop a property with environmental conditions."  According to Caffe Ribs, Dominy relies on the report of State environmental expert Ashby McMullan to assume that it would take up to eight years to obtain a certificate of completion, and to impose a discount rate for an eight-year holding period.  Caffe Ribs assails Dominy's assumption that the property is not presently marketable; Caffe Ribs contends that "[e]very expert at trial, including the State's own expert, concluded that the remediation posed no restriction in developing the property."  According to Caffe Ribs, "even if the certificate of completion were to take up to eight years to obtain, this would not preclude development."  We reject Caffe Ribs's challenges to Dominy's testimony.

We have found no record support for an assertion that Dominy admitted he lacked "opinions or competency to address what can be done to sell and develop property with environmental conditions."  Dominy acknowledged relying on environmental expert McMullan to evaluate the property's environmental status. He independently concluded that the property most likely would not be developed for eight years while it was undergoing remediation.  Dominy considered (1) that the full extent of contamination on the property had not been entirely defined; and (2) "historical activity" on the property, *i.e.*, how much remediation had been accomplished between 1991 when the contamination was first discovered and the

time of the taking in 2005.  Based on his review of TCEQ documents, McMullan's assessment, and the lack of Weatherford's financial motivation to pursue active attenuation, Dominy concluded that it probably would take eight years to accomplish remediation by natural attenuation and obtain a certificate of completion.

The focus here is not on whether remediation posed restrictions on development.  Rather, the pertinent inquiry is whether the market would support development of the property during cleanup and remediation.  In that respect, Dominy based his opinions concerning the property's potential development during remediation on reliable and industry-accepted analysis.

Dominy explained that, although the property was usable at the time of the taking, assessing its potential development and marketability requires analysis of how the market would react to the property in its condition at that time.  Dominy explained that he sent a survey to approximately sixty market participants including lenders, investors, and developers, which is an "acceptable method of measuring the marketplace's perception" of a particular property.  Dominy conducted his survey following Appraisal Institute requirements and "in compliance with my peer group on how they would perform such market interviews and surveys."  He also testified that such surveys are "recognized as a valid method for conducting appraisals" by the Uniform Standards of Professional Appraisal Practice.

Dominy also explained how he conducted his survey; that he told the market participants about the property's environmental status; and what specific questions he asked the market participants to answer.  The survey results supported his conclusion that the property most likely would not be developed until regulatory closure or a letter of no further action was obtained.

30

We conclude that the trial court acted within its discretion by allowing Dominy to testify at trial, and we overrule Caffe Ribs's fourth issue with respect to its improper assumptions argument.

## B.     Discounted Cash Flow Analysis

Caffe Ribs argues that "Dominy's discount rate analysis not only fails to find support in Texas as a proper methodology in condemnation practice, its application was even undercut by Dominy's own assumptions regarding indemnity for the cost of remediation." Caffe Ribs argues that Dominy reached an unimpaired property value using a comparable sales approach and then applied a "significant discount rate to further devalue the property to account for an eight–year holding period before the [p]roperty could be developed." According to Caffe Ribs, Dominy relied on Randall Bell's treatise, which called for a discount rate when the property is expected to bear remediation costs, but later Dominy conceded that the discount rate approach is inapplicable when a property owner is entitled to indemnity for remediation costs. Essentially, Caffe Ribs contends that Dominy's discount rate analysis constitutes improper methodology and should not be applied when a property owner is not responsible for remediation costs.

Caffe Ribs cites no authority for its contention that a "discount rate analysis" is an improper methodology in condemnation practice. Texas recognizes three approaches to determining the market value of condemned property: the comparable sales approach, the cost approach, and the income approach. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 871 (Tex. 2009). After using the sales comparison approach to determine the property's unimpaired value, Dominy used the income approach and performed a discounted cash flow analysis accounting for property-carrying costs during the eight-year holding period in which the property would not be developed pending remediation to determine the

31

property value as impaired or contaminated. Discounted cash flow analysis also is known as income capitalization; it is an accepted valuation approach in appropriate circumstances. *See Swanson v. Schlumberger Tech. Corp.*, 895 S.W.2d 719, 741 (Tex. App.—Texarkana 1994), *rev'd on other grounds*, 959 S.W.2d 171 (1997); *see also State v. Bristol Hotel Asset Co.*, 293 S.W.3d 170, 172 (Tex. 2009) ("The income approach consists of estimating the net operating income stream of a property and applying a capitalization rate to determine the property's present value."); *Polk Cnty. v. Tenneco, Inc.*, 554 S.W.2d 918, 921 (Tex. 1977) (The income approach to value involves estimating the future income of the property and applying a capitalization rate to that income to determine market value; the capitalization rate may be defined as the rate of interest investors would require as a return on their money before they would invest in the property, taking into account all the risks involved.).

Dominy testified that performing a discounted cash flow analysis to determine the impaired property value is supported by Appraisal Institute literature. He stated that the "Appraisal Institute has a book written by Bell, Randall Bell, that sets forth appraising damaged property." The book's title is "Real Estate Damages and Analysis of Detrimental Conditions." Dominy testified that he followed the procedures set forth by the Appraisal Institute and gave a detailed explanation of his analysis. Dominy testified that he (1) started with an unimpaired property value of $3,276,330 at the time of the taking; (2) subtracted annual costs associated with holding the property, such as taxes and insurance, for an eight-year period; and (3) applied an 18 percent discount rate because investors in the marketplace expect a return on their investment, and the 18 percent discount rate represents the national average in the land market investors would expect as their annual return. Dominy stated that he did not include environmental cleanup

costs in his discounted cash flow analysis.

According to Caffe Ribs, Dominy conceded on cross-examination that the "discount rate approach" does not "apply where the property owner was entitled to indemnity from a solvent company for remediation costs." Caffe Ribs links this claimed concession to an article by Randall Bell entitled, "The Analysis of Environmental Case Studies." Contrary to Caffe Ribs's contention, Dominy made no such concession. Additionally, the article to which Caffe Ribs refers does not state that the discounted cash flow analysis would not apply whenever there is an indemnifying party; instead, the article states: "Where an indemnifying party is financially solvent and willing to pay for all required remediation costs, the risk is reduced or may be eliminated altogether."

Dominy stated that he did not consider property cleanup costs in his discounted cash flow analysis. He did not dispute during cross-examination that Paul Revere and Weatherford were responsible for property cleanup costs. He also explained that he was not concerned about the cleanup costs itself; rather, he focused on the fact that the party responsible for the cleanup had unlimited access and time to complete the cleanup task under the indemnity agreements.

We reject Caffe Ribs's argument that there was "no support for Dominy's use of a discount rate," and we overrule its fourth issue in that respect.

## C. Comparable Sales Analysis

Caffe Ribs argues that "Dominy's opinion under the comparable sales method for unimpaired property was likewise tainted by speculation and improper assumptions." Caffe Ribs makes numerous arguments under this sub-issue, and we address each in turn.

The three traditional approaches to determining market value are the

comparable sales method, the cost method, and the income method. *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001). Courts have long favored the comparable sales method when determining the market value of real property. *Id.* Under a comparable sales analysis, the appraiser finds data for sales of similar property, then makes upward or downward adjustments to these sales prices based on differences in the subject property. *Id.*

Comparable sales must be voluntary and should take place near in time to the condemnation, occur in the vicinity of the condemned property, and involve land with similar characteristics. *Id.* Comparable sales need not be in the immediate vicinity of the subject land, so long as they meet the test of similarity. *Id.* But if the comparison is so attenuated that the appraiser and the fact finder cannot make adjustments for differences, a court should refuse to admit evidence of a "comparable" sale. *Id.*

First, Caffe Ribs states that "Dominy's expert opinion has been previously excluded from making subjective assumptions that are not reasoned or supported by the facts underlying his opinions" in *Weingarten Realty Investors*, 93 S.W.3d at 286. Caffe Ribs then concludes, without argument, that Dominy has made the same mistakes here in stating his comparable sales analysis; Caffe Ribs says his opinion is "highly speculative and subjective, is internally inconsistent, and is based on foundational data that is wrong and incomplete."

In *Weingarten*, this court held that the trial court did not abuse its discretion by excluding Dominy's expert testimony on the basis that it lacked a reliable foundation. *See id.* at 284–86. Dominy's expert testimony in that case was offered in support of an unequal-appraisal challenge to an appraisal district's assessment of a shopping center's appraised value for property-tax purposes. *See id.* 282–83. In the case under review, the trial court admitted different expert testimony by

Dominy regarding a different property in an eminent domain proceeding. The fact that Dominy was the expert witness involved in *Weingarten* does not, by itself, mean that *Weingarten* is relevant to the case at hand. Because of substantial differences between the expert testimony and the procedural posture, *Weingarten* is not on point.

Second, Caffe Ribs complains that Dominy makes inconsistent statements regarding the property's access. Caffe Ribs says Dominy states that the property's access is poor in one section of his report but then "describes the subject market area as having 'average' access" in another portion and describes "arteries in the area" as providing "excellent access to Interstate Highway 10 from virtually any portion of the subject neighborhood."

Dominy's statements about the property's access are not inconsistent. Dominy rated the immediate access to the property as poor in his report because the property is located on Old Katy Road; he explained that "Old Katy Road here is a two-lane asphalt paved road with open ditches on both sides. Between it and the railroad, there's a big ditch that ran down the side to provide for drainage."

Dominy rated the general subject market area access as average and explained:

> Primary east/west access in the area includes Westview, Old Katy Road, and Memorial Drive with the major artery being Interstate Highway 10 (Katy Freeway). North/south traffic in the market area is carried by Antoine Road, Bingle/Voss Road, Wirt/Chimney Rock Road, Blalock, Gessner Road and the Sam Houston Parkway. These arteries provide excellent access to Interstate Highway 10 from virtually any portion of the subject neighborhood. However, Interstate 10 is one of the most heavily traveled freeways in Houston and experiences daily traffic congestion during rush hours. Improvements to this thoroughfare are ongoing.

Dominy's statements about the property's access are not inconsistent as they relate

to the property's direct access as contrasted with the general market area's access.

Third, Caffe Ribs asserts that Dominy makes an inaccurate assumption regarding the purchase price of his Comparable Sale No. 2 when he lists the purchase price as $14.47 per square foot. According to Caffe Ribs, the back part of the property was purchased for that amount but "Dominy ignored revisions to the earnest money contract showing that the frontage area of the property—the part that Dominy focuses on for his comparable sale analysis—was actually purchased for $20/sq.ft."

Dominy testified that he confirmed the purchase price of $14.47 with the buyer's representative; he later was provided with a closing statement indicating the purchase price was $15.05 per square foot because the parties added 2.72 acres to the initial 20.67 acres, selling the 23.39 acre property for $15.05 per square foot. Dominy acknowledged that, although a 100-foot strip of land across the property's front was added for $20 per square foot, he "used $15.05 a foot for this entire tract" for his comparable sales analysis because "it wouldn't be fair to take a 100-foot strip of land . . . and try to compare that to the subject property." Dominy also testified that he considered this purchase price change and explained that it did not alter the appraised value of the property.

Caffe Ribs also complains that Dominy made an incorrect assumption regarding the utility of Comparable Sale No. 2. According to Caffe Ribs, Comparable Sale No. 2 was subject to significant zoning restrictions for development and "Dominy's report makes no adjustment, saying 'Zoning: N/A.'" Caffe Ribs complains that Dominy failed to make an adjustment for this restriction, and also made a 30 percent downward net adjustment on the property.

Dominy explained that, although it was an oversight to state that zoning was not applicable to Comparable Sale No. 2, he did not mention any zoning

restrictions regarding Comparable Sale No. 2 in his report "because it has the same highest and best use as the subject [property] does." Caffe Ribs cites no authority that Dominy was required to make an adjustment to a property subject to zoning when it has the same highest and best use as the property being appraised. Nor did Caffe Ribs's expert opine that such an adjustment was required. Thus, the fact that Dominy did not make an adjustment based on zoning restrictions does not preclude him from making a 30 percent downward net adjustment on the property as compared to Comparable Sale No. 2 based on other factors. Dominy's report shows that the 30 percent downward net adjustment was based on a 40 percent downward adjustment for location, frontage, and access; a 15 percent upward adjustment for size and shape; and a five percent downward adjustment for utility.

Making adjustments is part of the basic comparable sales method. *Williams v. State*, 406 S.W.3d 273, 291 (Tex. App.—San Antonio 2013, pet. filed); *see Sharboneau*, 48 S.W.3d at 182. "The question of the appropriateness of adjustments for differences relating to zoning was not a question of whether the basic comparable sales methodology was reliable." *Collin Cnty. v. Hixon Family P'ship, Ltd.*, 365 S.W.3d 860, 873 (Tex. App.—Dallas 2012, pet. denied). "Instead, it was a fact-intensive question of whether, in the judgment of the expert witness based on facts obtained during his investigation, adjustments permitted by the well-accepted methodology were appropriate in this circumstance." *Id*.

Fourth, Caffe Ribs contends that Dominy made "arbitrary and inconsistent adjustments for the size of the properties" because he made "no adjustment to his Comparable Sale No. 1, which was 2.6 times the size of the subject property" but adjusted his Comparable Sale No. 2 upward by 15 percent "for its inferior size, being 3.1 times the size of the subject property." According to Dominy, this adjustment is contradicted by the following statement he made in his appraisal

37

report under the heading "Size/Shape":

> The size and shape of the various comparables are considered to have some impact upon sale price. Sale 1, Sale 2 and Sale 3 are larger tracts than the subject, though to varying degrees. As such, they are considered to be inferior to the subject and upward adjustments to these sales were applied for this factor except as mitigated by shape.

Caffe Ribs contends that Dominy's "logic and reasoning cannot be replicated; it is not supported by any market data and is not reliable."

Contrary to Caffe Ribs's contention, Dominy's adjustment to Comparable Sale No. 2 as contrasted from Comparable Sale No. 1 is not arbitrary and inconsistent. Dominy made adjustments based on size and shape factors. He stated that he made upward adjustments to some properties to account for their inferior size unless the inferior size factor was "mitigated" by the shape of the properties, which is another factor Dominy considered to have an impact on a sale price. Dominy applied no adjustment to Comparable Sale No. 1 because the property's inferior size factor was mitigated by the property's shape. Conversely, Dominy applied an upward adjustment of 15 percent to Comparable Sale No. 2 to account for its inferior size; the property's shape did not warrant mitigation of the size factor.

Appraising property is not an exact science based on set mathematical formulas. *Harris Cnty. Appraisal Dist. v. Kempwood Plaza Ltd.*, 186 S.W.3d 155, 161 (Tex. App.—Houston [1st Dist.] 2006, no pet.). It is not error for an appraiser to use his personal experience and expertise to make adjustments based on factors such as size and shape. *Id.*; *see Harris Cnty. Appraisal Dist. v. Houston Laureate Assocs. Ltd.*, 329 S.W.3d 52, 58 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). With regard to Caffe Ribs's contention that Dominy's logic is not supported by market data, adjustments are not "deemed unreliable or invalid if they

have not previously been subject to peer review because the very nature of appraisal adjustments calls for a less rigid test of reliability and can hinge on an expert's experience." *Williams*, 406 S.W.3d at 291. The question is whether there is too great of an analytical gap between the data and Dominy's determinations. *See Kempwood Plaza Ltd.*, 186 S.W.3d at 161.

Here, we cannot say that Dominy's adjustments demonstrate such a gap. Dominy provided detailed data regarding the property and the comparable sales. Dominy explained that Comparable Sales Nos. 1, 2, and 3 were larger tracts of land and were considered inferior to the property; therefore, he applied upward adjustments to these sales to account for their inferior size except as "mitigated by shape." At trial, Dominy testified that the Comparable Sale No. 1 property's larger size was offset by the property's superior shape. Dominy also testified that he made a 15 percent downward adjustment for Comparable Sale No. 2 because the tract was large and "regular-shaped."

Fifth, Caffe Ribs argues that Dominy "double dips on certain adjustments" relating to Comparable Sale No. 1. Caffe Ribs claims that Dominy performed a double adjustment for the same factor when he made (1) a 20 percent downward adjustment for Comparable Sale No. 1's "superior utility" because of the "tract's ability to be subdivided into a number of tracts along its entire length on N. Eldridge Parkway;" and (2) a 30 percent downward adjustment for Comparable Sale No. 1's "Location/Access/Frontage" because of "superior frontage to depth ratio." Caffe Ribs says there is no "empirical research or market data" to support either adjustment.

Adjustments are not "deemed unreliable or invalid if they have not previously been subject to peer review because the very nature of appraisal adjustments calls for a less rigid test of reliability and can hinge on an expert's

experience." *Williams*, 406 S.W.3d at 291. The question is whether there is too great of an analytical gap between the data and Dominy's determinations. *See Kempwood Plaza Ltd.*, 186 S.W.3d at 161. Here, we cannot say that Dominy's adjustments demonstrate such a gap. Dominy's report provided detailed data about the property and about all his comparable sales; using the comparable sales data, Dominy then explained his adjustments:

**LocationAccess/Frontage**

Location adjustments tend to be somewhat subjective, as locational differences are often difficult to isolate. . . . In this case, all of the sales are located near the subject and all have frontage along the Katy Freeway service roads or along Old Katy Road.

Sale 1 is situated at the southwest corner of the eastbound IH-10 frontage road and N. Eldridge Parkway. Overall, this neighborhood is superior to the subject's neighborhood. In addition, the tract has direct access to the frontage road to IH-10 and is situated at a corner with two street access. These physical factors were also superior to the subject. This sale has a superior frontage to depth ratio when compared with the Subject. Overall, a downward adjustment was applied to this sale for these factors.

*       *       *

**Utility**

Land Sale 1 has superior utility when compared with the Subject. This superiority is reflected in this tract's ability to be subdivided into a number of tracts along its entire length on N. Eldridge Parkway. In addition, this sale's adaptability to a variety of land uses including multi-family and commercial is noted. Land Sale 2 is also superior to the subject in this regard because of the whole site's ability to be subdivided. Pad site subdivision of the land along the Katy Freeway street frontage is possible with development of the land north or behind the pad sites into a single or multiple users. Also, development of this site into multiple land uses including multi-family and commercial is noted. As a result, Land Sale 1 and Land Sale 2 are adjusted downward for this factor. The balance of land sales has similar utility compared to the subject and no adjustments were applied to these sales for this factor.

Additionally, Caffe Ribs's assertion that Dominy made an adjustment "twice for the same factor" for Comparable Sale No. 1 is negated by Dominy's explanation quoted above. With regard to the location, access, and frontage factor, Dominy made an adjustment because Comparable Sale No. 1 is located in a superior neighborhood; has direct access to the frontage road to Interstate-10; is a corner property with access to two streets; and has a superior frontage to depth ratio than the subject property. In contrast, Dominy made an adjustment for the utility factor because Comparable Sale No. 1's tract can be subdivided along N. Eldridge Parkway and Interstate-10's frontage road, and can be adapted to a variety of uses including multi-family and commercial.

Sixth, Caffe Ribs complains that Dominy's 10 percent upward adjustment for market conditions for Comparable Sale No. 3 was irrational. Caffe Ribs states that Comparable Sales Nos. 1 and 3 were located next to each other; Comparable Sale No. 3 was purchased in 2003 for $9.31 per square foot, and Comparable Sale No. 1 was purchased in 2005 for $19.25 per square foot. Caffe Ribs asserts that Dominy's upward market conditions adjustment for Comparable Sale No. 3 should have been higher considering that the "2005 sales price was 2.6 times the 2003 price."

Regarding Dominy's market conditions adjustment for Comparable Sale No. 3, Dominy testified that the market was increasing "between 2003 and 2005 . . . . It's subsequently changed; but at that point in time, I made an upward 10 percent adjustment for the time factor." Caffe Ribs did not specifically challenge Dominy's market conditions adjustment for Comparable Sale No. 1 as being too low. During cross-examination, Caffe Ribs asked Dominy if Comparable Sales Nos. 1 and 3 are "pretty close to what's called in the industry a paired sale, paired comparison." Dominy responded that "it's not really a good example of pairing,

41

because you've got differences in road frontages; you've got differences in size; you've got differences in major corner versus not on a major corner. There's a lot of different characteristics. But you can make adjustments to them, which is what I did."

Caffe Ribs also asked Dominy to explain the significance of the fact that, between Comparable Sales Nos. 1 and 3, the sales price per square foot for these adjacent properties doubled in two years; and Dominy explained as follows:

> [T]he significance of the doubling in two years had to do with several things; it had to do with passage of time, which we adjusted the first sale up 10 percent or almost a dollar a foot to adjust for the passage of time. But more significant is the fact that this other property has significant frontage on Eldridge Parkway that carries just under 30,000 cars a day into that Enclave complex down to the south which is part of that Energy Corridor. So that's the bigger influence is the fact that this is — one of them is on a very minor street corner. It's narrow. It doesn't have — it's got a total of 375 feet of frontage on the Katy Freeway. The other one has 621 feet of frontage on the Katy Freeway. There's 1123 frontage on Eldridge Parkway. So, you have size; you've got shape; you've got frontage; you've got a major traffic arterial that increases the utility of the latter sale that sold for 19.25 a square foot.

Based on this record, the evidence before us does not support Caffe Ribs's assertion that Dominy's 10 percent upward adjustment for market conditions was irrational.

Seventh, Caffe Ribs asserts that Dominy overlooked a pipeline easement on the Comparable Sale No. 1 property and "got the sales price wrong by more than $1 million" for Comparable Sale No. 3. Caffe Ribs concludes that these mistakes tainted Dominy's appraisal opinion, and that a new trial is required. Assuming without deciding that Dominy indeed made the asserted mistakes, Caffe Ribs fails to provide any argument or explanation for why these alleged mistakes tainted

Dominy's entire appraisal opinion so as to necessitate a new trial. *See* Tex. R. App. P. 38.1.

After considering all of Caffe Ribs's arguments, we reject its contention that Dominy's opinion under the comparable sales method was tainted by speculation and improper assumptions. Accordingly, we reject Caffe Ribs's argument that Dominy's opinions were unreliable and therefore inadmissible; we conclude that the trial court did not abuse its discretion by admitting Dominy's appraisal opinions; and we overrule Caffe Ribs's fourth issue.

## Conclusion

We affirm the trial court's judgment.


/s/    William J. Boyce
         Justice


Panel consists of Chief Justice Frost and Justices Boyce and Jamison.